Nancy SALMON, et. al., Appellants,

v.

CITY OF BLOOMINGTON, Appellee.

No. 53A01–0107–CV–256.

Court of Appeals of Indiana.

Jan. 11, 2002.

Michael L. Carmin, Andrews, Harrell, Mann, Carmin & Parker, P.C., Bloomington, IN, Attorney for Appellants.

Vickie Renfrow, Linda Runkle, Bloomington, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Residents of the Browncliff Subdivision ("Residents") of the City of Bloomington ("City") appeal the trial court's grant of summary judgment in favor of the City in the Residents' action seeking to disannex their properties from the City and for other related relief. We affirm.

### Issue

The restated issue before us is whether the City has succeeded in establishing that there are no genuine issues of fact and that, as a matter of law, the Residents are not entitled to relief pursuant to our disannexation statute, Indiana Code Section 36–4–3–16.

### Facts

The designated evidence reveals that the City annexed the Browncliff Subdivision effective February 11, 1996. As required by law, the City adopted a fiscal plan related to the Browncliff annexation. With reference to sanitary sewer service, it provided in pertinent part:

> The properties in the Annexation Area are currently not on City sewer.... Within three years of the Annexation's effective date, the City will ensure that sewer mains are available for hookup to the Annexation Area's properties. The estimated cost per household for hookup to the City sanitary sewer system is $3,000.... The cost for installation of City sanitary sewer is normally amor-

tized on the property owner's utility bill over a period of three years.... Within three years of the annexation's effective date, sanitary sewer service will be available to the Annexation Area in a manner equal to the Comparable Areas. The City will incur no cost for sanitary sewer services as a result of this annexation.

Appellant's Appendix pp. 63–64. There was some argument made at the time the annexation was proposed that its effective date be postponed until January 1, 1997, to allow the Residents more time to consider its potential impact, but the City Council voted not to delay the effective date. There is no record that a remonstrance was filed against the annexation.

At the City Council meetings where the Browncliff annexation ordinance was debated, Rule 13 of the City's Utility Service Board ("USB") was mentioned and discussed. USB Rule 13, which applies to "predominantly residential additions other than apartment developments," provides that before the City will extend sewer service to a neighborhood, several steps must be followed. Appellant's Appendix p. 87. First, sixty percent of the neighborhood residents must sign a petition expressing interest in receiving city sewer service; this does not obligate the signatories to obtain sewer service. After receiving a petition, the USB prepares the required engineering plans and obtains construction cost estimates. After receiving those estimates, the USB notifies the residents of the estimated cost per resident of constructing the sewer. At that point, sixty percent of the residents must commit to hooking on to the new sewer and pay a deposit before construction will begin. The Rules and Regulations of the USB were attached to the annexation fiscal plan as an exhibit.

On November 13, 1997, the Residents submitted a petition to USB indicating that owners of sixty-nine of the eighty-four Browncliff properties were interested in possibly receiving City sewer service. At that time, USB officials indicated that the cost of extending the sewer would likely exceed the initial cost estimate mentioned in the fiscal plan, and it was agreed that the City would pay for a detailed engineering design plan for the sewer and would conduct rock borings in the Browncliff Subdivision to arrive at a more precise cost estimate for the project.

The City hired a consultant, at a cost of $37,250, to estimate the cost of the project. Rock borings were also conducted, at a cost of $5,000, although some Browncliff residents, including parties to the disannexation petition, did not agree to allow borings to be conducted on their property. Sometime after the consulting work was completed, the Residents were invited to an October 1, 1998, meeting to discuss the results. The City disclosed at this meeting that the estimated cost of constructing a gravity sewer was $7,700 per resident, and that the design followed the "lay of the land" and would require the acquisition of easements through private property. It also reminded the Residents that a "good faith" deposit would be required from sixty percent of the property owners before any sewer construction would begin.[1] However, the City agreed to investigate a low-pressure pump sewer system for the Browncliff Subdivision, which the City indicated would not require the acquisition

---

1. To alleviate the financial impact caused by the increased expense of this particular sewer project, the City set the amount of the deposit at $500 instead of the twenty percent of the total construction cost formerly required by USB Rule 13. Additionally, the City was also apparently prepared to extend the Residents' repayment period for construction of the sewer extension from the three years required by USB Rule 13 to up to ten years.

of easements because it would follow the street right-of-ways, and additionally might result in a lower construction cost. Thus, the Residents were asked not to commit to the gravity sewer design at that time.

The City expended an additional $27,927 for a consultant to obtain cost estimates for a low-pressure pump system. In early 1999, the City also began exploring its ability to obtain the forty-six easements from Browncliff property owners that would be necessary for the gravity sewer design; after six months of effort, only nine property owners had agreed to grant easements. The City conducted another meeting on March 25, 1999. At that meeting, the results of the low-pressure sewer design consultation were communicated to the owners of forty-four Browncliff properties. The City received only eighteen responses to a questionnaire handed out at that meeting asking which sewer design option they preferred. On June 24, 1999, City officials met with William Kroll, president of the local neighborhood association, and it was decided that the City would seek bids on both the gravity and low-pressure sewer designs, and the Residents could decide which option to pursue, if any, after receiving the results of the bids.

The City received three responsive and responsible construction bids on September 27, 1999, the lowest of which resulted in a per household construction cost of between $8,900 and $9,000.[2] This was communicated to Kroll, and additionally the City obtained an agreement from the low bidder to extend the sixty-day statutory period for keeping a bid open by ninety days, or until February 27, 2000. Additionally, the City obtained a construction permit from the Indiana Department of Environmental Management and sought approval for "up-front" funding for the project from the USB in the amount of $665,000. The Residents, however, did not choose a sewer construction design, but instead filed suit on January 26, 2000, seeking to disannex their properties from the City because of its failure to complete the sewer extension within three years of the annexation's effective date, or by February 10, 1999. The City moved for summary judgment, which was granted on June 12, 2001. This appeal now follows.

## Analysis

A grant of summary judgment requires that no genuine issue of material fact exist and that the movant be entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *Lake County Equal Opportunities Council v. Greer*, 735 N.E.2d 206, 208 (Ind.2000). On appeal from summary judgment, the reviewing court analyzes the issues in the same fashion as the trial court, de novo. *Greer*, 735 N.E.2d at 208. The court must also view the pleadings and designated materials in the light most favorable to the non-movant. *Id.* A grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Hibler v. Conseco, Inc.*, 744 N.E.2d 1012, 1018 (Ind.Ct.App.2001). Once a summary judgment movant has made a prima facie showing that there is no genuine issue of material fact, the burden falls upon the non-moving party to identify a factual dispute that would preclude summary judgment. *Abbott v. Bates*, 670 N.E.2d 916, 921 (Ind.Ct.App. 1996). In response to a properly supported motion for summary judgment, the adverse party may not rest upon the mere allegations of his pleadings, but must designate to the trial court each material issue

---

2. The low bidder's estimate for the gravity sewer design was actually slightly less expensive than the low-pressure design, contrary to the consultant's estimates, but the two other companies' bids did provide lower estimates for a low-pressure system.

of fact that the party asserts precludes summary judgment and the relevant evidence pertaining to such issue or issues. *Id.*

The Residents' complaint sought disannexation of their properties from the City pursuant to Indiana Code Section 36–4–3–16(b), which provides that taxpayers within an annexed territory may be granted disannexation and other relief if they establish one of the following:

(1) That the municipality has without justification failed to implement the [fiscal] plan required by section 13 of this chapter within the specific time limit for implementation after annexation.[3]

(2) That the municipality has not provided police protection, fire protection, sanitary sewers, and water for human consumption within the specific time limit for implementation, unless one (1) of these services is being provided by a separate taxing district or by a privately owned public utility.

(3) That the annexed territory is not receiving governmental and proprietary services substantially equivalent in standard and scope to the services provided by the municipality, regardless of topography, patterns of land use, and population density similar to the annexed territory.

The Residents claim they are entitled to relief under subsections (1) and (2), but make no argument under subsection (3). We address the Residents' two arguments.

The Residents first argue that the City breached the annexation fiscal plan without justification because it did not provide hookups to the sewer main within three years of the annexation effective date, in violation of Indiana Code Section 36–4–3–16(b)(1). The City's first response to this argument is that it has fully complied with the fiscal plan by virtue of its compliance with municipal policy regarding sewer construction, as embodied in USB Rule 13. If the City's fiscal plan had explicitly stated that sewer hook-ups would be made available in accordance with USB Rule 13, i.e. only after a petition had been submitted by sixty percent of the residents, etc., there clearly would not have been a breach of the fiscal plan in this instance. That was not the case, however. The fiscal plan here could have been more clearly written. The plan suggests in some places that sewer hook-ups would be made available to the Residents regardless of compliance with USB Rule 13. It states that "the City *will ensure* that sewer mains are available for hookup to the Annexation Area's properties." Appellant's Appendix p. 63 (emphasis added). Additionally, section 8.01 of the fiscal plan, "Sanitary Sewer Service," never references Rule 13. We cannot say there has *not* been a breach of the fiscal plan, to the extent it suggests in places that the installation of sewer hook-ups was to be entirely self-executed by the City within three years of annexation.

■ However, under the plain language of the disannexation statute, a plaintiff seeking disannexation or other relief must

---

**3.** The portion of the fiscal plan statute relevant to this case provides that a fiscal plan must state:

> That services of a capital improvement nature, including street construction, street lighting, sewer facilities, water facilities, and stormwater drainage facilities, will be provided to the annexed territory within three (3) years after the effective date of the

annexation in the same manner as those services are provided to areas within the corporate boundaries, regardless of similar topography, patterns of land use, and population density, and in a manner consistent with federal, state, and local laws, procedures, and planning criteria. . . .

Ind.Code § 36–4–3–13(d)(5).

not only prove that the fiscal plan was breached, but also that such breach was "without justification." "Justification" is defined as "[a] lawful or sufficient reason for one's acts or omissions" or "[a] showing, in court, of a sufficient reason why a defendant did what the plaintiff ... charges the defendant to answer for." Black's Law Dictionary 870 (7th ed.1999). Here, we find no material issue of fact with respect to whether the City acted "without justification" in failing to provide sewer main hookups within three years of the annexation's effective date; it is clear the City did have justification or a plainly sufficient reason for not having provided sewer main hookups to the Residents within three years of the Browncliff annexation.

Although not explicitly mentioned in the fiscal plan, USB Rule 13 was discussed at City Council meetings where the Browncliff annexation was considered and its provisions were explained to the Residents in attendance at those meetings. The Residents were on notice as to its provisions and that the City intended to follow them. Furthermore, the fiscal plan clearly provided that the City would not pay the cost of constructing a sewer extension and that the cost would be borne by the Residents. When the Residents filed the requisite sixty percent interest petition in accordance with USB Rule 13 approximately twenty-one months after the annexation's effective date, the City initiated efforts to design and receive cost estimates for the extension of sewer service to the Browncliff Subdivision. The City also communicated the information it obtained to the Residents through group meetings or through the neighborhood representative, Kroll. The City attempted to address concerns of the Residents regarding costs and the granting of easements by investigating alternative sewer designs, and by offering alternative payment plans for construction. The City asked the Residents to choose which sewer design they preferred, but no choice was made.

These facts establish the prima facie existence of justification for the City's failure to provide sewer main hookups within three years of the annexation date, thus negating a necessary element of Residents' cause of action—that the City acted without justification. Rather, the City followed the procedures for extending sewer service provided in USB Rule 13 and varied from that rule in an attempt to accommodate the Residents' wishes and concerns. It expended considerable expense and time in developing engineering plans and obtaining cost estimates. Before proceeding to construction of the sewer, the City had good cause to insist on some assurance from the Residents that the construction would be paid for. In fact, it would be unreasonable and a waste of government resources for a municipality to press forward with a large capital improvement project such as this, the cost of which is to be entirely paid for by the benefiting property owners according to established municipal policy, without first obtaining some assurances that a large percentage of those property owners were actually willing to pay for the project.

In the face of the City's designated evidence, Residents were required to designate evidence that would create a material issue of fact as to justification so as to avoid summary judgment. They failed to do so. The only piece of evidence that requires some discussion comes from the deposition of Mike Phillips, the City's Director of Utilities. Phillips acknowledged that some sewer extension projects are not initiated by a neighborhood petition as provided in USB Rule 13, but the City's

HAND Department.[4] The Residents essentially claim this creates a question of fact as to whether the Browncliff Subdivision, as an annexed territory, is treated unfavorably as compared to other parts of the City, and that the City should have constructed the sewer extension without regard to USB Rule 13. We disagree. Phillips also indicated that the HAND-initiated projects were ones that would be financed in part by community development grants intended to assist low-to-moderate income families and, therefore, that only part of the cost of constructing the sewer extension would be recouped from the users. The Residents have not pointed to any sewer construction projects that were City-initiated outside of these special redevelopment projects and there is no reason to believe that USB Rule 13 is anything but uniformly applied otherwise. The fact that the City may choose to initiate sewer projects on certain occasions in the absence of a sixty percent neighborhood commitment does not render its reliance on USB Rule 13 unfair or unreasonable in other cases, particularly where it is expected that the cost of the project will be fully funded by the benefiting residents and not by special government grants.

As for the cost of providing sewer main hookups to the Residents, it is true that the cost estimates for doing so greatly exceed the $3,000 estimate mentioned in the fiscal plan. This does not constitute a breach of the fiscal plan. Indiana Code Section 36–4–3–13(d)(1) and (2) states that a fiscal plan must indicate the estimated cost "of planned services *to be furnished* to the territory to be annexed" and the "method or methods of financing the planned services." (Emphasis added.)

Here, the fiscal plan plainly provided that the cost of constructing the necessary extension of the sewer main would be borne by the Residents. The City essentially agreed to handle the administrative, logistical, and engineering aspects of arranging for the sewer main extension, but it did not agree to "furnish" a service to the extent of paying for the construction itself. This process is in accordance with USB Rule 13, which applies throughout Bloomington and states that neighborhood residents who wish to have sanitary sewer service must pay the necessary construction costs to extend the main, unless the construction cost is less than three times the estimated annual sewer revenue from the potential customers, which was not anticipated to be the case with the Browncliff Subdivision. Additionally, Indiana Code Section 36–9–23–29 permits a municipality to charge a fee for connections to a sewer based on the pro rata cost of constructing a local or lateral sewer sufficient to serve the property. *See Town Council of New Harmony v. Parker,* 726 N.E.2d 1217, 1226 (Ind.2000). We do not view the cost estimate as an integral part of the annexation fiscal plan, because the City never guaranteed that the cost would not exceed a certain level, or that it would pay a portion of the construction cost, and the Residents were not required to pay for an extension of sewer service as an obligation that would attach after annexation. They were free to reject paying for the sewer extension if they found it to be too expensive, as long as the existing septic systems did not fail. Hence, there is no breach of the fiscal plan based upon the City's failure to obtain a construction bid that was close to the cost estimate reflected in the fiscal plan.[5]

4. This apparently is the City's Housing and Neighborhood Development Department.

5. We also observe that the method for estimating the construction cost used for the Browncliff annexation fiscal plan, while obviously inaccurate, was not unreasonable. The

■ The Residents also argue with respect to the cost of extending the sewer main, particularly in their reply brief, that the City breached the fiscal plan by making the construction of a sewer service extension "dependent upon [Residents] first paying the costs associated with providing the sewer mains." Reply Brief p. 3. We have already observed from the full text of the fiscal plan regarding sanitary sewer service that the Residents were always expected to pay for the cost of this service. To the extent Residents now claim that a municipality cannot charge the cost of extending sewer service to the residents of an annexed territory, notwithstanding Indiana Code Section 36–9–23–29, such a claim should have been raised in a remonstrance challenging the annexation ordinance and/or fiscal plan. No remonstrance was filed within the sixty-day-after-adoption time limit of Indiana Code Section 36–4–3–11, and thus Residents are precluded from attacking the validity of the annexation and the accompanying fiscal plan, which requires the Residents to pay for any extension of sewer service. *See Albion Nat'l Bank v. Department of Financial Institutions,* 171 Ind.App. 211, 219–20, 355 N.E.2d 873, 878 (1976) (holding a collateral attack on annexation may be maintained only where annexation was made by a body or tribunal acting without jurisdiction or power to make the annexation, and is not available as to alleged errors, irregularities, and informalities not going to the jurisdiction of the tribunal).

The Residents also claim entitlement to disannexation because the City has not provided them with a sanitary sewer system, and Indiana Code Section 36–4–3–16(b)(2) permits disannexation if "the municipality has not provided police protec-

tion, fire protection, *sanitary sewers, and* water for human consumption within the specific time limit for implementation...." (Emphasis added.) Here, the Residents ask us to interpret the statutory term "and" to mean "or," and that by the City's not providing one of the enumerated services—i.e., sanitary sewers—they are entitled to disannexation. Even if we were to accept the argument that a plaintiff may be granted disannexation if a municipality has failed to "provide" *any,* as opposed to *all,* of the four listed services, the Residents here are not entitled to disannexation under this subsection as a matter of law.

■ We ordinarily endeavor to give words appearing in a statute their plain and ordinary meaning, absent a clearly manifested legislative purpose to do otherwise. *Department of Natural Res. v. Town of Syracuse,* 686 N.E.2d 410, 412 (Ind.Ct.App.1997). Additionally, statutory provisions covering the same general subject matter are *in pari materia* and should be construed together to produce a harmonious statutory scheme. *WorldCom Network Serv., Inc. v. Thompson,* 698 N.E.2d 1233, 1238 (Ind.Ct.App.1998), *trans. denied.* We also seek to harmonize our reading of a statute with precedent of our supreme court. *See Black v. ACandS,* 752 N.E.2d 148, 152 (Ind.Ct.App.2001), *trans. pending.* Here, we conclude, based on the entirety of the annexation statutory scheme and precedent of our supreme court, that although a municipality must "provide" sanitary sewers to an annexed territory, "provide" necessarily means to provide in a manner similar to that in which sanitary sewers are provided to the rest of the municipality.

estimate was based on the fact that seventeen neighborhood sewer extension projects completed during the six-year period prior to the

annexation resulted in an average per household cost of $2,200.

Acceptance of the Residents' construction of Indiana Code Section 36–4–3–16(b)(2) would lead to the requirement that all annexing municipalities *must* actually construct sanitary sewers in an annexed territory or else face disannexation. Indiana Code Section 36–4–3–13(d)(5), however, merely provides that services of a capital improvement nature, such as sewer facilities, must be provided to the annexed territory in the same manner such services are provided elsewhere in the municipality. It does not absolutely require the extension of sanitary sewers to an annexed territory. Moreover, in *Chidester v. City of Hobart,* 631 N.E.2d 908 (Ind. 1994), our supreme court clearly indicated that an annexing municipality has no absolute duty to provide sanitary sewers to an annexed territory. In that case, the City of Hobart contained large areas that were served by septic systems as opposed to sanitary sewers, and it was acceptable that the annexation fiscal plan simply provided that the same policy regarding whether sanitary sewers are extended to a certain area would be applied to the annexed territory; the fiscal plan contained no assurance that sanitary sewers actually would be extended to the annexed territory. *Id.* at 912. As the City of Hobart did in *Chidester,* the City of Bloomington has decided to apply a municipal policy regarding extension of sewer service to an annexed territory, namely USB Rule 13. It logically follows that if a municipality is not required by statute or supreme court precedent to extend sanitary sewer service to an annexed territory, a plaintiff cannot obtain disannexation solely on the ground that sanitary sewers in fact were not extended. Here, the designated evidence indicates the City "provided" sanitary sewers to the Residents in a manner similar to that in which sanitary sewers were "provided" to the rest of the City. The Residents are not entitled to disannexation pursuant to Indiana Code Section 36–4–3–16(b)(2).

■ After examining the statutory scheme, we find the existence of legislative intent that a plaintiff seeking disannexation and the granting of other relief under Indiana Code Section 36–4–3–16 carries a heavy burden, once an annexation has become final after the time period for remonstrating has passed, or a remonstrance has been rejected. Such relief is not impossible to obtain, but there must be a showing of egregious action (or a lack of action) on the part of the annexing municipality, such as the treating of the annexed territory differently from other parts of the municipality, a complete failure to provide basic municipal services, or a failure, *without justification,* to implement the terms of the annexation fiscal plan. We find that no genuine issue of material fact exists that would support disannexation of the Residents' properties under any of these theories, and thus we conclude that the City is entitled to judgment as a matter of law.

### Conclusion

The City's designated evidence establishes that although it arguably may have breached the precise terms of the fiscal plan, it had a valid justification for doing so. The Residents failed to designate evidence to counter this showing. Moreover, a failure to provide an annexed territory with sanitary sewers is not enough, by itself, to grant a complaint for disannexation. We affirm the grant of summary judgment.

Affirmed.

MATTINGLY–MAY, J., concurs.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Judge, concurring.

I concur but with a slight caveat.

I do not agree with the majority, as stated on page 447 of the opinion, that the Residents "ask us to interpret the statutory term 'and' to mean 'or'." They are, however, stating that they are entitled to disannexation because the City has failed to provide "one of the enumerated services—i.e., sanitary sewers." *Id.* This contention by the Residents is undoubtedly drawn from use of the word "and" in the disannexation statute itself. That provision states that disannexation is permissible if the City has not provided *all* of the enumerated services. Thus the absence of any one of the services is a failure to provide all of the services as required by use of the conjunctive "and."

In this regard, I would further add my view that the statutory requirement to "provide" the enumerated services merely means that the services must be made "available" to the residents in question in a manner similar to that in which the rest of the City is provided. In this sense, it is perfectly permissible for that availability of sewer service to be subject to Rule 13 of the USB which requires some responsibility upon the part of the residents, including payment of at least a portion of the cost of installation of the service.

Subject to the above comments, I fully concur in the affirmance of the summary judgment.