Doris A. **SADLER, in her official capacity as Clerk of the Marion Superior and Circuit Courts and as a member of the Marion County Election Board; Candace Marendt and Steven R. Eichholtz; each in their official capacities as members of the Marion County Election Board, Appellants–Defendants,**

v.

**STATE of Indiana ex rel. Joanne M. SANDERS, Rozelle Boyd, Lonnell (King Ro) Conley, Ron Gibson and Marion County Democratic Central Committee, Appellees–Plaintiffs.**

No. 49A02–0310–CV–864.

Court of Appeals of Indiana.

July 19, 2004.

William Bock, III, Mark J. Colucci, Kroger, Gardis & Regas, LLP, Indianapolis, IN, Attorneys for Appellants Marion County Election Board and Clerk of the Marion Circuit Court.

William R. Groth, Geoffrey S. Lohman, Fillenwarth, Dennerline, Groth & Towe, Indianapolis, IN, Attorneys for Appellees.

Daniel Ladendorf, Ladendorf & Ladendorf, Indianapolis, IN, Attorney for Appellant Marion County Election Board.

## OPINION

CRONE, Judge.

### Case Summary

Appellants-defendants Doris A. Sadler, in her official capacity as clerk of the Marion Superior and Circuit Courts and as a member of the Marion County Election Board ("the Board"), and Candace Marendt and Steven R. Eichholtz, each in their official capacities as members of the Board (collectively, "Appellants"), appeal the trial court's grant of a preliminary injunction in favor of appellees-plaintiffs Joanne M. Sanders, Rozelle Boyd, Lonnell (King Ro) Conley, Ron Gibson, and the Marion County Democratic Central Committee (collectively, "Appellees"). We affirm.

### Issues

We combine and restate Appellants' three issues as follows:

I.  Whether the trial court erred in enjoining the Board from using an "office block" ballot format with its optical scan voting system; and

II. Whether the trial court erred in enjoining the Board from including the words "The A Team" within a ballot device used to designate candidates of the Marion County Republican Party.

### Facts and Procedural History[1]

The bipartisan Indiana Election Commission ("the Commission"), which consists of four gubernatorial appointees, is charged with administering Indiana election laws and governing "the fair, legal, and orderly conduct of elections[.]" Ind.

---

1. We heard oral argument on June 14, 2004, in Indianapolis. We commend counsel for the quality of their oral and written appellate advocacy.

Code § 3–6–4.1–14(a). Among its duties, the Commission must approve voting systems before they may be used in an election. *See, e.g.,* Ind.Code § 3–11–7–1(a). One such system, known as a ballot card voting system, uses optical scan ballot cards "on which votes are: (1) recorded by marking the card or paper in ink or pencil; and (2) tabulated by an optical system that reads the marks on the card or paper." Ind.Code § 3–5–2–33.9. Sometime before December 2002, the Commission approved a ballot card voting system that uses the M–100 optical scan ballot tabulator developed by Election Systems & Software, Inc. ("ES & S"). The M–100 tabulator is designed to read a maximum of three vertical columns of voting marks on each side of an optical scan ballot card.

Each three-member county election board consists of the circuit court clerk and persons nominated by the county chairmen of the two major political parties. Ind.Code §§ 3–6–5–2, –5. County election boards are responsible for conducting elections and administering election laws within the county, preparing all ballots except those prepared by the Election Division of the Secretary of State's Office ("the Division"),[2] and distributing all ballots to all precincts in the county. Ind.Code § 3–6–5–14(a). In Marion County, the Board consists of Sadler, the Republican circuit court clerk, Marendt, a Republican, and Eichholtz, a Democrat. On December 31, 2002, the Board contracted with ES & S to purchase over nine hundred M–100 tabulators, as well as associated software and support services, at a cost of over $10,000,000. One such support service is ballot layout, which involves determining the ballot size, defining the ballot order

and instructions, and preparing ballot proofs. Appellants' App. at 528 (contract).

Indiana Code Chapter 3–11–2 governs the form of general election ballots. Indiana Code Section 3–11–2–5 provides in relevant part, "The nominees of a political party or group of petitioners shall be listed on the ballots under the name and device of the party or petitioners as designated by them in their certificate or petition, or if none is designated, then under some suitable name or device." Indiana Code Section 3–11–2–6(a) provides that each party's device and nominees shall be placed on the ballot in columns or rows according to the number of votes that party's candidate received "in the county for secretary of state at the last election[.]" "A column or row for write-in voting shall be placed to the right of all party and independent columns on the ballot." Ind. Code § 3–11–2–6(c). This so-called "party-column" or "Indiana" ballot format was used on traditional lever voting machines and differs from the so-called "office block" or "Massachusetts" ballot format, in which nominees are grouped in rows or columns according to the respective offices they seek.

Indiana Code Section 3–11–2–10 is entitled "Arrangement of ballot" and reads in pertinent part as follows:

(a) The name or title of the political party or independent ticket shall be placed at the top of the ballot. The device of the political party or independent candidate shall be placed immediately under the name of the political party or independent ticket. The instructions for voting a straight party ticket shall be placed to the right of the device . . . .

---

**2.** *See* Ind.Code §§ 3–6–4.2–1 to –14 (establishing and outlining duties and composition of Division); *see also* Ind.Code § 3–6–4.2–12 (providing that Division is responsible for preparing and distributing "paper ballots for the election or retention of persons to federal and state offices and for public questions").

. . . .

(e) Except for variations in ballot arrangement permitted for voting machines under IC 3–11–12–7, ballot card voting systems under IC 3–11–13–11, or electronic voting systems under IC 3–11–14–7, the list of candidates of the political party shall be placed immediately under the instructions for voting a straight party ticket.

Indiana Code Section 3–11–13–11 reads in relevant part, "The ballot information, whether placed on the ballot card or on the marking device, should, as far as practicable, be in the order of arrangement provided for ballots under IC 3–11–2. However, the ballot information may be in vertical or horizontal rows or in a number of separate pages." For the November 2003 Marion County general election, ES & S used its automated software to design an optical scan ballot in the office block format, with the candidates grouped according to office in three vertical columns.

Indiana Code Section 3–8–7–11 governs devices used to designate candidates on ballots. A device "may be any appropriate symbol[,]" as long as it has not previously been filed by a political party or candidate and is not the coat of arms or seal of the state or of the United States, the national or state flag, or "any other emblem common to the people." Ind.Code § 3–8–7–11(b), -(c). The traditional devices designating Republican and Democratic candidates in Indiana are a soaring eagle and a rooster, respectively. For the November 2003 Marion County general election, Marion County Republican Party Chairman John Keeler filed with the Board a copy of a device incorporating a soaring eagle and the words "The A Team."

On September 17, 2003, a draft optical scan ballot prepared by ES & S was distributed to Democratic Board member Eichholtz, who took issue with both the office block format and the Republican "A Team" device. Eichholtz requested an emergency Board meeting to address these concerns. A Board meeting was held on September 19, 2003, but resulted in no definitive action.

On September 23, 2003, Appellees filed a petition for a temporary restraining order and a complaint for mandate and injunctive relief against Appellants. That same day, the trial court issued a temporary restraining order.[3] The next day, Appellees filed an amended complaint in which they alleged, *inter alia*, that the ballot's office block format and the Republican "A Team" device were contrary to law. On September 24, 2003, Judge Gerald S. Zore recused himself. On September 25, 2003, our supreme court appointed the Honorable James E. Harris as special judge. On October 1, 3, 6, and 8, the trial court held a hearing on Appellees' motion for a preliminary injunction.

On October 8, 2003, the trial court issued an order reading in relevant part as follows:

The dispute in this case centers on two issues:

[ (a) ] the device to be used by the Republican party and placed on the ballot card as well as absentee voting and other election materials, and

(b) whether the format of the ballot card, including the device, meets the requirements of Indiana statute[.]

**FINDINGS OF FACT**

---

**3.** The temporary restraining order does not appear in the record before us. According to Appellants, the order prohibited Sadler and the Board from printing and/or distributing ballots. Appellants' Br. at 2–3.

(1) A general election is scheduled to be held in Marion County, Indiana on November 4, 2003 (the "Election"). The voters will vote on that date for candidates to municipal offices for the City of Indianapolis, including candidates for Mayor and the Indianapolis City–County Council.

Some voters within Marion County will also elect on that date candidates for municipal offices in other included cities and towns located within the County, including, among others, candidates for offices within the City of Lawrence, the City of Southport, the City of Beech Grove and the [C]ity of Speedway.

(2) On November 4, 2003, Marion County will utilize for the first time in a general election optical scan voting machines in all of its precincts. Optical scan voting machines utilize a pre-printed ballot card. The ballot card has three separate columns on each side of the ballot. The names of candidates and offices may be printed on both sides of the ballot card. Groups of candidates may be included within each of the three columns on each side of the ballot card. Voters cast their votes for candidates by marking a small oval that is located next to the candidate['s] name. Prior to 2003, voters in Marion County had used lever voting machines for several decades.

(3) The plaintiffs are the Marion County Democratic Central Committee (the "Democrat Party") and the four nominated Democrat candidates for at-large election to the Indianapolis City–County Council (the "Democrat Candidates"). The Democrat Candidates allege that they are registered voters and taxpayers residing in Marion County.

(4) The Defendants Doris A. Sadler, Candace Marendt, and Steven R. Eichholtz are the members of the Marion County Election Board ("Election Board"). Doris A. Sadler is the Clerk of the Marion Circuit and Superior Courts and is a member of the Election Board by virtue of her position as Clerk. Sadler is a Republican. Candace Marendt is the Chairman of the Board and was nominated for her position by the Chairman of the Marion County Republican Party. Steven R. Eichholtz is the Vice-Chairman of the Board and was nominated for his position by the Chairman of the Marion County Democratic Party. The Election Board is the administrative body assigned by state law with the responsibility to conduct all elections, prepare ballots and distribute ballots for elections in Marion County. Ind.Code 3–6–5–14. As Circuit Court Clerk, Sadler, with the approval of the Election Board, acts on behalf of the Election Board and her actions in this capacity are considered action[s] of the Election Board[.] I.C. 3–6–5–18.

(5) The Election will be the first municipal election (other than the May 2003 primary election) conducted in Marion County with an optical scan voting system. Optical scan voting systems use a *ballot card,* as defined at Ind.Code 3–5–2–4, which is marked by the voter and placed in the optical scan voting system by the voter. The vote is then counted by the optical scan voting system.

(6) The optical scan voting machines were certified by the Indiana Election Commission and purchased from Election Systems & Software, Inc. ("ES & S") pursuant to a contract with the Election Board and the City of Indianapolis, Indiana (the "Contract") at a cost exceeding $10,000,000.00. The contract provided for additional services including the layout and printing of ballot cards to be used for the covered elections.

(7) The ES & S optical scan voting machines and software can be operated using ballots which group candidates by political race or office or using ballots which list candidates in columns by political party. All of the presentations made by ES & S to a number of entities both public and private including the Indiana State Election Commission, used ballots which grouped candidates by political race.

There are two major ballot formats used in the United States. One is known as the "party-column" ballot. In this format, candidates for office are grouped by the political party with which they are affiliated. Candidates are clearly identifiable as affiliated with a political party because only nominees of that party are included within the same row or column on the ballot. The other ballot format is the "office block" ballot. In this format, candidates are grouped according to the office they seek, without regard to party affiliation. The "party-column" ballot is referred to by political scientists as the "Indiana Ballot" because Indiana was the first state to adopt this ballot form. The "office block" ballot is sometimes referred to by political scientists and in political science literature as the "Massachusetts Ballot."

The lever machines previously utilized in Marion County were configured in the format of a "party-column" ballot in which all of the candidates affiliated with a single political party were included within the same row as the device and name of the party. The machines were configured in the "party-column" format in the 2002 general election, as well as the last municipal election in 1999. As a result, candidates for office in Marion County have historically been clearly identified with their political party and placed in a horizontal row or vertical column under or opposite their respective political party's name and device.

(8) Drafts of forms of the ballot prepared by ES & S for use in the Election were exchanged between ES & S and Mr. Robert Vane, the Marion County Election Board Administrator, during the first two weeks of September 2003. Mr. Vane is an employee of the Election Board. On or about September 16, 2003, an agreed upon ballot format was arrived at through consultation between Mr. Vane and ES & S (the "Ballot"). The proposed ballot grouped candidates according to the office sought, rather than according to the candidates' political party affiliation. Thus, the ballot took the form of an "office block" ballot. . . . It was only at this time that the proposed ballot was distributed to the political party chairs, members of the Election Board, and a number of candidates.

(9) The optical scan voting machines used in Marion County are fully capable of reading ballot cards that include the names of candidates on both the front and back side of the ballots or on multiple ballot cards.

The testimony of ES & S employee Wendy Orange clearly shows that ballot cards can be formatted and arranged in a manner that permits "party-column" voting. The format of such a ballot would include at the top of each of the three columns on the front side of each ballot card the name and device of each of the three political parties, with the Republican Party in the far left column, the Democratic Party in the middle column, and the Libertarian Party in the far right column. To the left of each of these names and devices would be an oval by which voters could cast a straight-party vote for the candidates affiliated with each political party. The

candidates for each office within the City of Indianapolis would be included under the name and device of each political party, with an oval to the left of their name by which a vote could be cast for each candidate. On the reverse side of the ballot card would be located ovals and lines for voters to cast votes for write-in candidates. To the extent that voters are entitled to cast votes for candidates within the included cities and towns within Marion County, a second ballot card in the same format as the offices for the City of Indianapolis can be used[.]

(10) The Marion County Republican Party had timely submitted to the Election Board on August 20, 2003 pursuant to Ind.Code 3–7–8–11(e) a proposed device for use on the Election Ballot. The device submitted by the Marion County Republican Party contains the words "The A Team" in addition to the pictorial representation of a soaring eagle.

Since the Republican candidate for Indiana Secretary of State received the most votes in Marion County of any candidate for that office in the November 2002 general election, the Republican candidates in the November 2003 election are to be placed in the "19" ballot position.

The Republican Party's new device was submitted to the Indiana Election Division by letter from Marion County Republican Party Chairman John Keeler around that date. A copy of this letter was sent to Republican Election Board member Candace Marendt around August 20. A copy of this letter was *not* sent to Democratic Election Board Member Eichholtz. Eichholtz was unaware of the new political device for the Republican Party until the time he received the proposed ballot from Va[ne], around September 17, 2003.

The purpose of the new device is to serve as a marketing tool for the Republican Party's candidates who appear on the November 4, 2003 ballot. The words "The A Team" are part of an overall promotional campaign for those candidates.

The Election Board has refused to remove the Republican Party's new political device containing the words "The A Team" from the official ballot, and in fact, the proposed ballot includes that device.

(11) Immediately upon becoming aware of the objectionable form of the proposed ballot, Mr. Eichholtz requested an emergency meeting of the Election Board. On September 19, 2003, the Election Board held an emergency meeting to discuss the form of the ballot. Mr. Eichholtz expressed his concern at the September 19, 2003 Election Board meeting that the ballot proposed by ES & S was legally deficient in at least two respects: (1) that the use of the "office block" ballot format rather than the "party-column" violated state law, and (2) that the Republican Party's use of a device which included the words "The A–Team" was illegal. Despite Mr. Eichhol[t]z's concerns, a majority of the Election Board has indicated an intention to utilize the ballot in the form prepared by ES & S, which includes grouping candidates by office sought rather than by party affiliation, and inclusion of the Republican Party's new device that includes the political slogan, "The A Team." The Plaintiffs filed this lawsuit on September 23, 2003, two (2) business days after the Election Board indicated its intention to utilize this ballot form at its September 19, 2003 meeting, as soon as could reasonably be expected.

(12) The "office block" Ballot challenged by the Plaintiffs, which groups candidates by office rather than party, is in substantially the same format as the layout of absentee ballots used in the 2000 and 2002 Marion County elections and is similar to the ballot layout used for years in numerous other Indiana counties which use optical scan voting equipment and/or direct recording electronic voting equipment.

Professor Raymond Scheele, testified that a ballot layout which groups candidates by office rather than by party is used in many states throughout the country and the Ballot layout was fair.

(13) Plaintiffs did not introduce any evidence that the Ballot layout or the Republican device bearing the words "The A Team" would harm them in any way. Rather, Plaintiffs contend that the Ballot layout and device were unlawful as a matter of statutory interpretation without attempting to establish harm resulting from either the Ballot layout or use of the Republican device.

(14) A preliminary injunction could— if issued to the extent originally requested by the Plaintiffs—impact the election in the following ways: (a) adversely impact mail-in absentee voting, (b) adversely impact in-office absentee voting, [ (c) ] adversely impact poll worker training, (d) a potential to delay the Election, (e) significantly impact on Election preparations, (f) create a possibility of Court intervention in the administration of the Election. A preliminary injunction of lesser scope would have less impact. Extending election deadlines is another possible, but undesirable, alternative.

The printing and distribution of absentee ballots has been suspended and delayed since a temporary restraining order was issued in this matter by Judge Gerald S. Zore on September 23, 2003. As of October 3, 2003, the Election Board h[a]d a list of approximately 1,300 applications for absentee ballots. Of those, 400 were received on October 2, 2003. After September 25, 2003, pursuant to Indiana law, absentee ballots are required to be mailed within five (5) days of the County Clerk['s] receipt of the application for an absentee ballot. Ind.Code 3–11–4–18. However, due to the temporary restraining order issued in this case, it is now twenty-seven (27) days before the Election and no absentee ballots have been mailed to Marion County absentee voters. It is reasonable to believe that the Clerk can pla[y] "catch up" in mailing the ballots.

A change in the Ballot format as requested by the Plaintiffs would require substantial modifications to the computer hardware and software used to tabulate ballots in Marion County and [ ] associated delays in printing ballots would significantly impact on the mailing of absentee ballots. Changing the Ballot format in the manner requested by Plaintiffs would have a significant impact on in-office absentee voting, perhaps depriving many Marion County residents of the right to vote by absentee ballot.

In Marion County more than 3,000 poll workers and other personnel must be trained in order to conduct the Election in an orderly fashion. Poll worker training [was to] begin on October 6, 2003. An injunction could adversely affect poll worker training.

Ms. Orange testified that a party column ballot format such as described in Plaintiffs' Amended Complaint would require two-sided ballots and, in some areas of the County require ballots consisting of two pages.

Ms. Orange testified that under some conditions granting the request for a preliminary injunction could result in a postponement of the election. M[s]. Sadler confirmed that in her judgment, granting an injunction would likely postpone the Election unless preparations can be conducted faster than any election preparations have previously been accomplished. been prohibited due to the temporary restraining order [sic].

Various estimates were made as to the costs to be incurred for printing ballots in the present form and as requested by the plaintiffs. Elections are costly but a small price to pay for the privilege [they grant] to each citizen of this county. ES & S has agreed via its contract that the system and materials it has provided, including software, comply with "all applicable material local, state, and federal standards, laws, rules, regulations, guidelines, and requirements[.]" [F]urther, ES & S and the Election Board have agreed in the contract to "comply with all applicable election laws and regulations" in performing their obligations under the agreement. Plaintiffs have requested that this Court retain continuing jurisdiction over the administration of the 2003 municipal elections in Marion County.

The Court would hope that such action would not be necessary.

## FINDINGS OF LAW

ELECTION BOARD

(1) The Election Board is an administrative body whose decisions are entitled to deferential review by a trial [c]ourt. *Clay v. Marrero,* 774 N.E.2d 520, 521 (Ind.Ct.App.2002).

(2) It is the responsibility of the Election Board to, among other things, "[c]onduct all elections and administer the election laws within the county", to "[p]repare all ballots except those prepared by the election division" and to "distribute all ballots" for the Election. IC 3–6–5–14.

(3) It is fundamental that a court may not simply "substitute its decision[s] for that of the [county election] board" despite the fact that the Court might have chosen to make a different decision if the matter had been left to the Court. *Clay,* 774 N.E.2d at 521.

(4) A decision of a county election board must be upheld by a reviewing court "[u]nless the decision is illegal." *Clay,* 774 N.E.2d at 521.

IC 3–11–2–16 provides for the procedure to be followed by an election board if a ballot does not comply with Indiana statute or contains an error or omission[.]

AUTHORITY TO ISSUE A PRELIMINARY INJUNCTION

(5) "The power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor." *Barlow v. Sipes,* 744 N.E.2d 1, 5 (Ind.Ct.App.2001), *trans. denied; Crossmann Communities, Inc. v. Dean,* 767 N.E.2d 1035, 1040 (Ind.App.2002) (a preliminary injunction is an extraordinary remedy).

(6) Generally, parties seeking a preliminary injunction must establish four elements by a preponderance of the evidence: (1) that their remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) that they had at least a reasonable likelihood of success on the merits; (3) that the threatened injury to the movants outweighs any potential harm to the non-movants from the grant of the injunction; and (4) that the public

interest is not disserved by issuance of the injunction. *Tilley v. Roberson,* 725 N.E.2d 150, 153–54 (Ind.Ct.App.2000).

(7) Where the conduct sought to be enjoined is clearly in violation of a statute, courts have adopted a more relaxed standard that relieves a party moving for preliminary injunctive relief from demonstrating two of these elements. Under this "per se" rule, the moving party need not demonstrate irreparable harm or that the balance of hardships is in his favor. *Union Twp. School Corp. v. State of Indiana ex rel. Joyce,* 706 N.E.2d 183, 192 (Ind.Ct.App.1998).

(8) There is widespread agreement by courts throughout the country that the "law recognizes that election cases are different from ordinary injunction cases.... Interference with impending elections is extraordinary .... and interference with an election after voting has begun is unprecedented." *Southwest Voter Registration Educ. Project v. Shelley,* 344 F.3d 914, 919–20 (9th Cir. 2003) (rejecting an effort to enjoin the California recall of Governor Gray Davis).

(9) The Indiana Constitution establishes that "[g]eneral elections shall be held on the first Tuesday after the first Monday in November." Ind. Const. Art.2 § 14.

(10) "[B]ecause the conduct of elections is so essential to a state's political self-determination, the strong public interest in having elections go forward generally weighs heavily against an injunction that would postpone an upcoming election." *Cano v. Davis,* 191 F.Supp.2d 1135, 1139 (C.D.Cal.2001).

FORM OF BALLOT

(11) I.C. 3–11–2 contains statutory provisions regarding the general form of ballots in Indiana. I.C. § 3–11–2–2 indicates that the provisions of I.C. 3–11–2 apply to the creation of ballots by election boards for local offices. I.C. § 3–11–2–5 requires that the nominees of a particular political party "shall be listed on the ballots under the name and device of the party". The General Assembly's use of the term "shall" indicates that the obligation to place the candidates of a particular party "under the name and device" of the party is mandatory. *Sholes v. Sholes,* 760 N.E.2d 156, 159 (Ind.2001).

(12) I.C. 3–11–2–6(a) requires that the device and list of nominees of the "major political party whose candidate received the highest number of votes in the county for secretary of state at the last election" be included "in the first column or row on the left side of the ballots." Further, I.C. 3–11–2–6(a) requires that the major political party whose candidate received the second highest number of votes in the same race and election be placed in [the] "second column or row." Finally, I.C. 3–11–2–6(a) requires that any other political party be included in the same order. The General Assembly's use of the term "shall" to describe these obligations again reveals that this ballot arrangement, requiring that the device and list of nominees of political part[ies] be placed in separate columns or rows in the order specified by statute, is mandatory.

I.C. 3–11–2–10 provides additional requirements indicating the General Assembly's intent that ballots take the form of a "party column" ballot. I.C. 3–11–2–10(e) provides that "Except for variations in ballot arrangement permitted for ... ballot card voting systems under IC 3–11–13–11, ... the list of candidates of the political party shall be placed immediately under the instructions for voting a straight party ticket."

IC 3–11–2–12.7(b) provides that, with respect to at-large seats on legislative bodies of political subdivisions, candidates "shall be listed in alphabetical order according to surname within each row or column on the ballot".

(13) I.C. 3–11–13–11 permits limited variations in the form of ballots for ballot card voting systems, which include the optical scan voting system used in Marion County. I.C. 3–11–13–11 specifies that: "The ballot information, whether placed on the ballot card or on the marking device, should, as far as practicable, be in the order of arrangement provided for ballots under IC 3–11–2. However, the ballot information may be in vertical or horizontal rows or in a number of separate pages."

I.C. 3–11–13–11 tightly circumscribes the Election Board's discretion to deviate from the general ballot form provisions of I.C. 3–11–2[.]

The fact that I.C. 3–11–13–11 gives the Election Board the discretion to extend the ballot to separate pages reveals, by implication, that the General Assembly did not intend to give it other forms of discretion. *Forte v. Connerwood Healthcare, Inc.*, 745 N.E.2d 796, 800 (Ind.2001).

STATUTORY INTERPRETATION

(14) It is just as important to recognize what a statute does not say as it is to recognize what it does say. *Herron v. State*, 729 N.E.2d 1008, 1010 (Ind.Ct. App.2000).

A court must read a statute within the context of the entire act, and not in isolation. *In re Visitation of A.R.*, 723 N.E.2d 476, 479 (Ind.Ct.App.2000). Courts are required to adopt a construction of a statute which sustains the Act, carries out its purposes, and renders all parts thereof harmonious. *Id.*

DEVICE

(15) I.C. 3–8–7–11(b) permits political parties in Indiana to use "any appropriate symbol" on ballots as their "device." The statute also proscribes the use as devices any symbol previously filed by a political party with the Indiana Election Division, the coat of arms or seal of the state or the United States, the nation[al] or state flag, or any other emblem common to the people. I.C. 3–8–7–11(c).

I.C. 3–14–3–16(b) prohibits any person from knowingly electioneering on election day within the polls or within fifty (50) feet of the entrance to the polls. As used in that section, "electioneering" is broadly defined to include "expressing support or opposition to any candidate or political party . . . ."

## CONCLUSIONS

(1) A court may not read into a statute that which is not the expressed intent of the legislature. The General Assembly has not specifically stated that the general ballot form statutes set forth in I.C. 3–11–2 do not apply to optical scan ballot cards. It would have been an easy matter for the General Assembly to adopt a clear statute indicating that the "party-column" ballot form required by I.C. 3–11–2–5, 3–11–2–6, 3–11–2–10, and 3–11–2–12.7(b) does not apply to optical scan ballots. Because it has not done so, the Court must harmonize I.C. 3–11–13–11 so as to give effect to the mandatory provisions of the general ballot form statutes.

(2) ES & S failed to provide a proposed ballot for review by the Democratic member of the Election Board until the week of September 17, 2003, when less than seven (7) weeks remained until the date of the election and approximately [one] (1) week remained until the Election Board was required to

begin distributing ballots to absentee voters. Delays have resulted from the failure to provide a ballot that complied with state law.

(3) The ballot form created by ES & S and seemingly adopted by the Election Board, ... does not comply with the statutory dictates of I.C. 3–11–2–5, 3–11–2–6, 3–11–2–10, 3–11–2–12.7(b), and 3–11–13–11 because it fails to include candidates for office within the same column or row as the name and device of the political party with which they are affiliated.

(4) I.C. 3–11–13–11 does not provide the Election Board with unlimited discretion to decide what portions of I.C. 3–11–2 with which to comply. I.C. 3–11–13–11 makes this clear by revealing that the Election Board's discretion is limited to placing the "ballot information" in "a number of separate pages." Where, as here, it is feasible to comply with the general ballot form provisions of I.C. 3–11–2 by extending the ballot to separate pages, the Election Board has no discretion to deviate from the mandates of those statutes.

(5) Here, the provisions of I.C. 3–11–2–5, 3–11–2–6, 3–11–2–10, and 3–11–2–12.7(b) would be rendered meaningless if I.C. 3–11–[1]3–11 were .interpreted to grant the Election Board the discretion to choose not to follow these mandatory provisions. General election laws regarding ballot form must be reconciled to give effect to the general ballot form, wherever possible. *Wright v. Gettinger,* 428 N.E.2d 1212, 1219–20 (Ind.1981[).]

(6) The Republican Party's new device contains a political slogan, "The A Team," in addition to the soaring eagle that it has used for many years. The purpose of "The A Team" slogan is to market the Republican Party's candi-

dates in this election. It is the intent to only use the device for this election.

IC 3–8–7–11(c) tells us what cannot be used in a device. It was the opinion of the Republican members of the Election Board that those provisions were the only standards to be applied and anything else was o'k.[ ]

The Court would suggest—and the evidence would support—a belief that the device is to help voters to relate to the candidates of a particular political party, arising from a time when many voters were uneducated or attempting to adjust to the customs and habits and voting methods of a new, adopted land. The device was to help the voters. If that is not the purpose, then devi[c]es are surplusage and not deserving of a place on the ballot. Although there are historical examples to the contrary, it seems best to the Court that we not start down a path of allowing the device to become an electioneering tool. The ballot—in the eyes of the Court—should be a neutral document.

IC 3–8–7–11(b) is instructive as to what can be used as a device. But for the exceptions previously mentioned, the device is to be an "appropriate symbol". Webster's New World College Dictionary, 4th Edition, defines "symbol" as "something which stands for, represents, or suggests another thing". If that definition applies to the "A–Team" device, it would seem that the meaning of the symbol is left to the broad imagination of thousands of Marion County voters.

The Republican Party's new device is not an "appropriate symbol" within the meaning of I.C. 3–8–7–11[ (c) ] because it contains a political slogan, namely the words "The A Team." Because the device is not an "appropriate symbol," it cannot be included on the official election ballot.

(7) Even if the Republican Party's new device could be considered an "appropriate symbol" within the meaning of I.C. 3–8–7–11(c), the Republican Party's new device constitutes "electioneering" that is prohibited by I.C. 3–14–3–16(b). Because the official ballot will be located within the voting booth, the ballot should not include a marketing device for a particular political party. This is prohibited electioneering. The statute serves as a statement from our General Assembly that the polling place is to be protected from partisan politics; that our citizens should be able to cast their ballots away from the noise of electioneering and in a solemn and reflective manner and place[.]

(8) The Republican Party's device, and specifically "The A Team" slogan, is also prohibited by I.C. 3–11–2–8, which prohibits forms of writing on the ballot that are not specifically permitted by the election code. No provision of the code authorizes the placement of a party's political slogan on the ballot.

(9) As to the Republican Party's ballot device containing the words "The A Team", there is no evidence to indicate that there is anything technologically difficult about changing the device to the Republican Party's traditional soaring eagle without the slogan "The A Team." The Court finds that this can be done without any additional expense to the public or without any delay in the printing of ballots. The public interest is served, rather than d[is]served, by requiring that the ballot be printed in a manner that removes a political slogan from the official ballot and the voting booth.

(10) There is a strong public interest in having elections conducted at the time specified in the Indiana Constitution. This Court would suggest that Election Day is a unique day on the political and cultural calendar in Indiana and that failing to hold an election on that day could cause numerous difficulties, including, but not limited to:

1. difficulty in staffing, with thousands of volunteers, an election held on a subsequent day that is not a holiday and is not commonly known as an election day;

2. hardship on candidates and elected officials who have expended tremendous personal and private resources and preparations in reliance on the constitutionally required election day;

3. problems with the orderly transition of power from current office holders to incoming office holders; and

4. voter apathy or non-participation due to uncertainty regarding the timing of the election.

(11) As to changing the ballot form from an "office block" format to a "party column" format, the Court finds that a delay in the November 4, 2003 election is not the inevitable consequence of ordering the Defendants to comply with state law.

(12) The Plaintiffs have proved that the balance of harms in this case weigh[s] in favor of granting an injunction with limited scope.

(13) The continuing impairment of the Election by the proposed injunction is not to be taken lightly. Pursuant to the provisions of the Indiana Code, the Election should have begun on September 25, 2003, when absentee ballots were first entitled to be cast.

(14) Because the Court concludes that the Defendants have violated state election law by adopting a ballot format that includes an inappropriate political slogan and that fails to group candidates under

the name and device of their political party, the Court finds that the "per se" rule is applicable here. The Plaintiffs are entitled to preliminary injunctive relief if they establish by a preponderance of the evidence a reasonable likelihood of success on the merits and that the public interest will not be d[is]served by the grant of injunctive relief.

(15) The Plaintiffs are reasonably likely to prevail on the merits of their amended complaint.

(16) The public interest will not be d[is]served by entry of a preliminary injunction limited in scope to the ballots to be used on election day coupled with the use of the ballot which has been proposed (with limited modifications) for absentee voting.

(17) The Plaintiffs have requested that this Court retain continuing jurisdiction over this matter and manage preparations for the upcoming Election in Marion County between now and November 4, 2003. The court declines the opportunity but with an awareness that under limited circumstances the court may continue to have jurisdiction in this case.

(18) The ballots for the November 4, 2003 election have not yet been printed. Therefore, there are no additional printing costs associated with having to replace ballots that are already printed. Any costs associated with printing on the back side of ballots and on additional ballot pages should have been anticipated by both the Election Board and ES & S given the clear dictates of Indiana law regarding the ballot form. To the extent that ES & S is responsible for additional expenses associated with the failure to comply with state law, the contract between the Election Board and ES & S may permit the Board to recover such expenses from ES & S.

The public interest is not [dis]served by the issuance of an injunction that requires only that the Defendants comply with the clear dictates of law.

Having entered the above findings of fact and conclusions of law as required by Trial Rules 65(D) and 52, THE COURT NOW FINDS that the Plaintiffs' Motion for Preliminary Injunction should be granted, in part, and denied, in part, and IT IS ORDERED that the Defendants, Doris A. Sadler, Candace Marendt, and Steven Eichholtz, in their official capacities as members of the Marion County Election Board, and their agents, employees, and attorneys, and all others under their control and in active concert with them, be restrained and enjoined from printing or causing to be printed, distributing or using on election day in the November 4, 2003 municipal election in Marion County, the proposed ballot card in the format attached to this Order as Exhibit "A". However, the format may be used for voting absentee if the following changes are made:

(A) that the Republican device be changed to the soaring eagle[;]

(B) that there be a one line separation between the candidates of the three parties for the office of City–County Council–At–Large[.]

The Court would suggest, but not order, that the wording of the Split–Ticket paragraph in the instruction section of the ballot be reworded to make the instruction more clear.

The Court further orders the Defendants to confer and work with representatives of ES & S to provide a ballot card that complies substantially with a party-column format as provided by Indiana statute. The Defendants and their agents, employees, attorneys, and those acting in concert with them are

further enjoined from utilizing any ballot format that is inconsistent with the findings of fact and conclusions contained within this Order.

The Defendants and their agents, employees, attorneys, and those acting in concert with them, are enjoined and restrained as set forth above effective this date until further order of the Court.

Appellants' App. at 6–17 (some alterations added).

On October 9, 2003, Appellants filed a notice of appeal. The next day, this court granted Appellants' motion for expedited appeal and ordered briefing completed by October 21, 2003. Oral argument was scheduled for October 24, 2003. On October 14, 2003, Appellants filed a motion to remand for further proceedings, which this court granted that same day. On October 15, 2003, after a hearing, the parties entered into an agreement modifying the trial court's order that reads in relevant part as follows:

1. For purposes of the November 4, 2003 municipal election only, it is agreed that the Marion County Election Board shall utilize a ballot with the office block arrangement of candidates similar to the ballot being used for absentee voting under this Court's October 8, 2003 Order. . . .

2. Nothing herein shall be deemed to constitute a waiver of any party's legal positions with respect to any ballot arrangement or the use of "The A–Team" in the Republican Party's device with regard to any future elections.

3. Nothing in this Agreement shall be construed to constitute a waiver of any party's legal positions with respect to the appeal of this Court's October 8, 2003 Order currently pending before the Indiana Court of Appeals. . . .

4. Nothing in this Agreement shall be construed to constitute a waiver of any legal rights of any party other than as expressly set forth in this Agreement.

*Id.* at 20. We now address the merits of Appellants' appeal.

### Discussion and Decision

#### *I. Ballot Format*

Appellants contend that the trial court erred in enjoining the Board from using an office block ballot format with its optical scan voting system. As a preliminary consideration, Appellants contend that Appellees failed to exhaust their administrative remedies and that the trial court therefore lacked jurisdiction to consider the matter. *See, e.g., Romine v. Gagle,* 782 N.E.2d 369, 379 (Ind.Ct.App.2003) ("It is well established that when the legislature has provided a statutory scheme with an exclusive administrative remedy, our courts lack jurisdiction to hear the matter until the administrative procedures have been exhausted or request for relief has been denied."), *trans. denied.*[4] We note, however, that "the requirement of exhaustion of administrative remedies 'will be relaxed where there is grave doubt as to the availability of the administrative remedy.'" *Smith v. State Lottery Comm'n of*

4. Appellants warn us of the perils of failing to "strictly limit the grounds upon which trial courts may review administrative decisions regarding the conduct of elections," chief among them being a "flood" of pre-election lawsuits filed for purposes of political advantage and a resulting decrease in the public's confidence in the judiciary. Appellants' Br. at 33 n. 20. When the administrative process

suffers an irretrievable breakdown, as it did in the instant case, judicial intervention may be a party's last and only resort. The agreement reached by the parties on the eve of the election is not, as Appellants would have us believe, convincing proof of the availability of an administrative remedy in the first instance, but rather a last-minute compromise dictated by practical and political necessity.

*Ind.,* 701 N.E.2d 926, 931 (Ind.Ct.App. 1998) (citation omitted), *trans. denied* (1999).

■ We first observe that the Board is not governed by the Administrative Orders and Procedures Act ("AOPA") and is therefore not subject to its exhaustion requirement. *See Clay v. Marrero,* 774 N.E.2d 520, 521 n. 3 (Ind.Ct.App.2002) (citing Ind.Code § 4–21.5–1–3); *see also* Ind. Code § 4–21.5–5–4 (AOPA exhaustion requirement). We further observe that no exclusive administrative remedy exists for a party challenging the legality of a ballot "prepared" by a county election board.[5]

Exclusivity may be determined by examining the provisions of the statute in question. Typically, the expression of exclusivity will come in either of two forms. Some statutes will affirmatively state that its provisions constitute the exclusive remedy for such actions. In others, the statute provides that judicial review is available only after the reme-dies provided in the statute are exhausted.

*Romine,* 782 N.E.2d at 379 (citation omitted). Indiana's election laws contain no such exclusivity provisions.[6] Given Appellees' lack of an available administrative remedy, we conclude that the trial court had jurisdiction to consider their request for a preliminary injunction.

■ In reviewing the trial court's grant of the preliminary injunction, we employ the following standard:

The grant or denial of a request for a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion. When determining whether to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. When findings and conclusions thereon are made, we must determine if the trial

---

**5.** We use the term "prepared" advisedly here, given that the disputed ballot was merely a draft ballot and that the Board did not officially approve its preparation before Appellees filed suit. The Board's failure to act at the September 19 emergency meeting indicates that Appellees' administrative remedies, if any, would have been futile. *See Smith,* 701 N.E.2d at 931 (acknowledging futility exception to exhaustion requirement; "To prevail upon a claim of futility, 'one must show that the administrative agency was powerless to effect a remedy or that it would have been impossible or fruitless and of no value under the circumstances.' ") (citation omitted).

**6.** Appellants state that a county election board may investigate alleged election law violations, *see* Ind.Code § 3–6–5–31, but they fail to mention that the board must make the threshold determination of whether "there is substantial reason to believe an election law violation has occurred[.]" *Id.* Here, the Board would have been faced with the task of determining whether to investigate itself. It is interesting to note that on several occasions, legislation has been proposed that would permit a member of a county election board to file a petition with the Commission if the member has "verifiable information that an election ballot for the member's county does not comply with the requirements of [Indiana Code Chapter 3–11–2] or is not in the form required by law[.]" S.B. 150, 112th Gen. Assemb., 2nd Reg. Sess. (Ind.2002) (proposing addition of Ind.Code § 3–11–2–17 to Indiana Code). Under the proposed legislation, the Commission must make an investigation and then hold a hearing if it determines that there is reason to believe that the ballot does not comply with chapter 3–11–2 or is not in the form required by law. *Id.* "If, after the hearing, the commission determines that the ballot fails to comply with one (1) or more of the requirements of [chapter 3–11–2] or is otherwise not in the form required by law, the commission shall take the action it considers appropriate under IC 3–6–4.1–21(c)." *Id.* Such action would include referring the matter to the attorney general for a civil proceeding or to a prosecuting attorney in the event of a criminal violation. Ind.Code § 3–6–4.1–21(c).

court's findings support the judgment. We will reverse the trial court's judgment only when it is clearly erroneous. Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. Moreover, the power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor.

*Robert's Hair Designers, Inc. v. Pearson,* 780 N.E.2d 858, 863 (Ind.Ct.App.2002) (citations, quotation marks, and alteration omitted).

▇ To obtain a preliminary injunction, the moving party typically must show by a preponderance of the evidence that:

(1) the movant's remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) threatened injury to the movant outweighs the potential harm to the nonmoving party resulting from the granting of an injunction; and (4) the public interest would not be disserved.

*Apple Glen Crossing, LLC v. Trademark Retail, Inc.,* 784 N.E.2d 484, 487 (Ind. 2003).

▇ "However, when the acts sought to be enjoined are unlawful, the plaintiff need not make a showing of irreparable harm or a balance of the hardship in his favor." *L.E. Servs., Inc. v. State Lottery Comm'n of Ind.,* 646 N.E.2d 334, 349 (Ind. Ct.App.1995), *trans. denied.*

The elimination of two prongs eases the burden on the party seeking the injunction. When the *per se* rule is invoked, the court has determined that the defendant's actions have violated a statute and, thus, that the public interest is so great that the injunction should issue regardless of whether the plaintiff has actually incurred irreparable harm or whether the plaintiff will suffer greater injury than the defendant. Accordingly, invocation of the rule is only proper when it is clear that the statute has been violated.

*Union Twp. Sch. Corp. v. State ex rel. Joyce,* 706 N.E.2d 183, 192 (Ind.Ct.App. 1998) (citation omitted), *trans. denied* (1999). Appellants contend that the trial court erroneously invoked the *per se* rule in this case. We disagree.

In reviewing the relevant statutes, we note that "[a] question of statutory interpretation is a matter of law to be determined by this court. We are not bound by a trial court's legal interpretation of a statute and need not give it deference. We independently determine the statute's meaning and apply it to the facts before us." *Perry–Worth Concerned Citizens v. Bd. of Comm'rs of Boone County,* 723 N.E.2d 457, 459 (Ind.Ct.App.2000) (citations omitted), *trans. denied.* In construing statutes, our goal "is to seek out and give effect to the intent of our legislature. In attempting to determine legislative intent, we give considerable deference to an interpretation of a statute by an administrative agency charged with administering the statute." *Area Interstate Trucking, Inc. v. Ind. State Dep't of Revenue,* 574 N.E.2d 311, 313 (Ind.Ct.App.1991) (citations omitted), *trans. denied.* Nevertheless, an agency's interpretation of a statute "is not binding upon this Court when that

interpretation is incorrect or if the legislative will is obvious." *Ind. Civil Rights Comm'n v. Sutherland Lumber*, 182 Ind. App. 133, 140, 394 N.E.2d 949, 954 (1979), *trans. denied.*[7]

"We ordinarily endeavor to give words appearing in a statute their plain and ordinary meaning, absent a clearly manifested legislative purpose to do otherwise. Additionally, statutory provisions covering the same general subject matter are *in pari materia* and should be construed together to produce a harmonious statutory scheme." *Salmon v. City of Bloomington*, 761 N.E.2d 440, 447 (Ind.Ct.App.2002) (citation omitted). We must determine and then apply the legislative intent underlying the statutes and construe them

> in such a way as to prevent absurdity and hardship and to favor public convenience. In so doing, we consider the objects and purposes of the statute[s], as well as the effects and consequences of such an interpretation. We will not read into a statute that which is not the manifest intent of the legislature. Hence, it is as important to recognize what a statute does not say as it is to recognize what it does say. The first and often the last step in interpreting a statute is to examine the language of the statute. We are guided by the principle that the best evidence of the legislature's intent is the language found in the statute itself.

*Robinson v. Gazvoda*, 783 N.E.2d 1245, 1250 (Ind.Ct.App.2003) (citations and quotation marks omitted), *trans. denied.*

As previously mentioned, Indiana Code Section 3–11–2–5 provides, "The nominees of a political party or group of petitioners *shall* be listed on the ballots under the name and device of the party or petitioners as designated by them in their certificate or petition, or if none is designated, then under some suitable name or device." (Emphasis added.) This statute unambiguously mandates that the party-column format be the "default setting" for ballots in Indiana. *See Romine*, 782 N.E.2d at 379 ("When the word 'shall' appears in a statute, it is construed as mandatory rather than directory unless it appears clear from the context or the purpose of the statute that the legislature intended a different meaning.' ") (citation omitted). This mandate is not absolute, however. Indiana Code Section 3–11–2–10 acknowledges that variations in ballot arrangement for ballot card voting systems are permitted under Indiana Code Section 3–11–13–11. *See* Ind.Code § 3–11–2–10(e) ("Except for variations in ballot arrangement permitted for ... ballot card voting systems under IC 3–11–13–11, ... the list of candidates of the political party shall be placed immediately under the instructions for voting a straight party ticket."). Indiana Code Section 3–11–13–11 provides, "The ballot information, whether placed on the ballot card or on the marking device *should, as far as practicable,* be in the order of arrangement provided for ballots under IC 3–11–2." (Emphasis added.) Under this statute, the legislature granted

---

**7.** Appellants cite *Sutherland Lumber* for the proposition that "[t]here is a presumption of legislative acquiescence in an agency's interpretation when no change is made in the statute." *Sutherland Lumber*, 182 Ind.App. at 140, 394 N.E.2d at 954. "While it is true that legislative acquiescence may in certain instances legitimize various activities, the legislature must have knowledge of the particular act taking place, or there is nothing in which

to acquiesce." *Brighton v. Schoffstall*, 401 N.E.2d 84, 86 (Ind.Ct.App.1980). Appellants offer no support for their intimation that the legislature was aware of the Commission's approval and the Division's review of voting systems that use an office block ballot format. *See* Appellants' Br. at 15–16 (summarizing testimony of Division co-director Bradley King).

county election boards discretion to determine the practicability of placing ballot information in the order of arrangement specified in Indiana Code Chapter 3–11–2. *See Pittsburgh, C., C. & St. L. Ry. Co. v. Indpls., C. & S. Traction Co.*, 169 Ind. 634, 637, 81 N.E. 487, 488 (1907) (determining that statutory phrase "if the court shall find it practicable" implies discretion).

■ The problem in the instant case, however, is that the Board (through its vendor, ES & S) used an office block format as the "default setting" without first determining the practicability of using a party-column format as required by Indiana Code Sections 3–11–2–5 and 3–11–13–11.[8] We disagree with the trial court's order to the extent it suggests that the Board had no discretion to use an office block ballot format, but we agree with its determination that the Board violated state election law, specifically by failing to use a party-column ballot format without first determining its practicability. *See* Ind.Code §§ 3–11–2–5, 3–11–13–11.[9] Consequently, Appellees were not required to "make a showing of irreparable harm or a balance of the hardship in [their] favor." *L.E. Servs., Inc.*, 646 N.E.2d at 349.

With respect to the two remaining requirements for a preliminary injunction, Appellants do not specifically challenge the trial court's conclusion that Appellees demonstrated at least a reasonable likelihood of success at trial, but instead dispute its conclusion that the public interest would not be disserved by the granting of an injunction. Appellants refer to testimony regarding the time it would have taken to reprogram the M–100 tabulators and to redesign, test, and print new ballots;[10] the difficulty of training election volunteers; and the possibility of errors and a postponement of the election. The fact remains, however, that no one testified that revising the ballot format before the November 4 election date would be impossible or that other insurmountable problems were certain to arise. Appellants' argument is a request to reweigh the evidence in their favor, which we may not do. We wholeheartedly agree with the trial court's conclusion that the public interest is not disserved "by the issuance of an injunction that requires only that the [Appellants]

---

**8.** Appellants observe that the M–100 tabulators were publicly demonstrated in 2002 using an office block ballot format "at meetings attended by officeholders and representatives of both Republican and Democrat parties" and that this format "was used in drafts of the ballot worked on by Election Board employees throughout the summer and distributed to the Appellee Marion County Democratic Party in August, 2003." Appellants' Reply Br. at 18. We find these observations unpersuasive. Notwithstanding the ballot format used for public demonstration purposes, it is presumed that the Board will follow the law in preparing ballots used during an election. Moreover, there is no indication that Board member Eichholtz received a copy of the draft ballot before September 17, 2003.

This case illustrates the pitfalls of public agencies abdicating their statutory responsibilities to private vendors. Appellants state that ES & S "is a vendor of election voting equipment and election services, including ballot preparation and is employed in more than 40 States." Appellants' Br. at 4. Appellants fail to mention, however, whether any of those states have laws similar to Indiana's that require the use of party-column ballots.

**9.** Appellants state that the trial court specifically did not find that the office block ballot format is unfair. The question here is not whether the office block format is fair, but whether it complies with Indiana election law.

**10.** Appellants claim that ES & S employee Wendy Orange testified that "this process would take approximately fifty-five days." Appellants' Br. at 38. In fact, Orange testified that the process "could take up to fifty days[.]" Tr. at 329.

comply with the clear dictates of law." Appellants' App. at 17.

In sum, we affirm the trial court's grant of the preliminary injunction with respect to the Board's use of an office block ballot format. Given our determination that the Board failed to assess the practicability of using a party-column ballot format, rather than erred in making such an assessment, issues regarding the meaning of "practicable" and the standard by which a county election board should assess practicability are not squarely before us. It seems clear, however, that a board should develop a record of its deliberations regarding ballot format as a means of forestalling possible challenges and preparing for any challenges that do arise. The legislature's stated preference for the party-column ballot format may be likened to a "rebuttable presumption" in its favor, and a county election board must overcome that presumption with sufficient proof of that format's impracticability before it may use another ballot format with a given voting system in a given election.

## II. Republican Party Device

■■■ Appellants contend that the trial court erred in enjoining the Board from including the words "The A Team" within a ballot device used to designate candidates of the Marion County Republican Party. Appellees argue that the issue is moot, referring to Marion County Republican Party Chairman John Keeler's acknowledgement that he intended the "A Team" device to be used only for the November 2003 election. Tr. at 363.

An issue is generally deemed to be moot when the case is no longer live and the parties lack a legally cognizable interest in the outcome of its resolution or where no effective relief can be rendered to the parties. Nonetheless, even when an appeal is moot and no practical remedy is available to the parties, we can review issues under the public interest exception, which may be invoked when the case involves a question of great public importance which is likely to recur.

*Bd. of Comm'rs of Morgan County v. Wagoner,* 699 N.E.2d 1196, 1199 (Ind.Ct. App.1998) (citation omitted). In the instant case, we conclude that the issue of the legality of the "A Team" device is both moot and, even if of great public importance, unlikely to recur.

Indiana Code Section 3–8–7–11 reads as follows:

(a) Except as provided in subsection (f), if a political party has filed a statement with the election division (or any of its predecessors) that the device selected by the political party be used to designate the candidates of the political party on the ballot for all elections throughout the state, the device must be used until:

(1) the device is changed in accordance with party rules; and

(2) a statement concerning the use of the new device is filed with the election division.

(b) Except as provided in subsection (c), the device may be any appropriate symbol.

(c) A political party or an independent candidate may not use as a device:

(1) a symbol that has been previously been filed by a political party or candidate with the election division (or any of its predecessors);

(2) the coat of arms or seal of the state or of the United States;

(3) the national or state flag; or

(4) any other emblem common to the people.

(d) Not later than noon, August 20, before each election:

(1) *the state chairman of each political party* whose candidates are to be certified under this section; or

(2) an individual filing a petition of nomination for candidates to be certified under this section;

shall file with the election division a camera-ready copy of the device under which the candidates of the political party or the petitioner are to be listed so that ballots may be prepared using the best possible reproduction of the device.

(e) This subsection applies to a candidate or political party whose name or device is to be printed only on ballots prepared by a county election board. Not later than noon, August 20, *the chairman of the political party* or the petitioner of nomination shall file a camera-ready copy of the device under which the candidates of the political party or the petitioner are to be listed with the county election board *of each county in which the name of the candidate or party will be placed on the ballot.*

(f) If a copy of the device is not filed in accordance with subsection (c) or (d), or unless a device is designated in accordance with section 26 or 27 of this chapter [regarding selection of devices for factions within a political party], the election division or county election board is not required to use any device to designate the list of candidates.

(Emphases added.)

▮ Bearing in mind the principles of statutory interpretation, we conclude that only a *state* political party chairman may file a copy of a device with a county election board. We first observe that subsection (d) of the statute specifically refers to state political party chairmen, whereas subsection (e) does not specifically refer to county political party chairmen. *See J.A.W. v. Marion County Dep't of Pub. Welfare,* 687 N.E.2d 1202, 1210 n. 21 (Ind.

1997) (applying rule of *ejusdem generis,* which provides that " 'where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned' ") (quoting BLACK'S LAW DICTIONARY 517 (6th ed.1990)). Our interpretation is further buttressed by subsection (e)'s requirement that a copy of a device be filed in *each* county in which the political party will be placed on the ballot; it would be absurd to suggest that a county political party chairman possesses this statewide authority.

Accordingly, we conclude that Keeler had no authority to file a copy of the "A Team" device in the first place, and that the likelihood of the state Republican party chairman filing a copy of a similar device in the future is so remote as to be purely speculative. Because this issue is both moot and unlikely to recur, we decline to address it.

Affirmed.

BAKER, J., and BARNES, J., concur.